Good morning. We have a packed house. I'm not really accustomed to this most of the time. I chuck it up to the popularity of Judge Greenaway and Judge Krause. We'll call the first matter of oral argument, which is Tineo v. Attorney General. Is it Sergio or Sergio? Curcio. Curcio? Yes. I'm not sure when to use the proper Italian pronunciation of the hard C. Yes, it got Americanized a long time ago. Nick Curcio on behalf of Petitioner Jose Tineo. With court permission, I'd like to reserve three minutes of my time for rebuttal. Thank you, your honors. As the court knows, this case is about whether Petitioner Jose Tineo is a United States citizen. The BIA in this case construed the applicable statutes in a way that completely preclude the fathers of illegitimate children from conveying citizenship on those children, even when the child is in their care and even when the child's mother is deceased. Could you help me with what use it is you intend to make of the expired passport? Your honor, we believe that the expired passport, under this court's precedence and under the BIA's precedence, creates a rebuttable presumption of citizenship that the government bore the burden of rebutting with clear, unconvincing... There's nothing in Moreno that says that, right? In Moreno? No, your honor. All right, so you're relying on Delmore? We're relying on Delmore and then the BIA's interpretation of Delmore or application of Delmore in matter of paralata, where it said that, as your honors are aware, Delmore was not based on a formal finding of citizenship. It was just a letter. Right, nor does it explicitly set forth the burden shifting, but that would seem to be the practical implication of how it should work, right? Yes, well it does, I think, use the term prima facie case and it also sets forth the clear, convincing and unequivocal evidence standard. I think the only question in this case is how that applies to what the government terms as a legal error. We take issue with that characterization. We don't believe that this can really be considered a legal error because of the, at least, ambiguities in the statute. When you look at the rebuttable presumption and think about it in the context of Moreno, isn't it so that the petitioner has to come forth with something with regard to proof of U.S. citizenship? So, the way we think this works is that when Mr. Chenaio submitted his passport, the burden then shifted to the government to disprove his citizenship and it could have done that by proving that he obtained that in fraud, which it tried to actually allege that he did, but there was no evidence of that. I don't believe Moreno is applicable here at all and in fact neither does the government, especially it says in its brief that Moreno doesn't control this case. Even if we accept your position that there's still a rebuttable presumption and that Delmore remains good law after Moreno, that goes to a factual question, right? If there's a rebuttable presumption that it can then be rebutted, but here the question before us is a legal one. There's no dispute, I take it, between the parties as to biological paternity. That's correct. So, if we conclude that the way that the statute is written as a legal matter precludes citizenship, that takes care of rebutting any presumption, right? I think I agree with that to the extent that this Court concludes that the statute unambiguously precludes citizenship here. I think that's what the Court held in the Edward v. Bryson case. I think that's what the Second Circuit held in Hazam v. Carey, I believe, fairly recently. But we don't think that this Court can do that. The point is your argument, if I understand you correctly, your argument succeeds or fails based on your legal argument, not on the presumption, because you're not raising with us, and the government hasn't raised any factual dispute as to whether a rebuttable presumption would apply or not. And if you can't, after Moreno, rely on the issuance of a passport, an expired passport, if that is conclusive, then we need to make a determination on the legal question to answer your appeal, right? In part, Your Honor, our position is that this Court doesn't need to necessarily go all the way to hold that our construction of the statute is the best construction, only that it is a plausible construction. And if it is a plausible construction, we have a prior adjudication by the State Department using a plausible construction of the statute. We believe that under the Delmore line, that is entitled to some degree of deference. But the OLC opinion identifies a number of alternative constructions, and it goes out of its way in footnote three to talk about one of those, the one the government has adopted here in view of Wynne not violating equal protection. While it adopts a certain position, the BIA in this case has adopted another one. So help us through, if we are doing our own statutory construction here, can you walk us through the statute itself? And particularly on the construction point, we already have Robinson in our circuit, where we characterize the statute as involving children who are under the age of 21 with other qualifications. Albeit a dicta there suggesting that we view the statute as requiring more of what comes after the including. And if we get past that point, I think we're going to want to spend some time with you today understanding why this case isn't controlled by Catwell on equal protection grounds. Sure. So starting with the statutory question, Your Honor, we acknowledge that a number of courts have essentially assumed that this imposes some limitation. There haven't been a lot of cases actually challenging what this means, and I don't believe Robinson raised such a challenge either. So our argument is twofold. It's one based on the statutory analysis in the OLC's opinion that says that this is a plausible construction. Once you admit that it is a plausible construction, then you need to look to the canon of constitutional avoidance if there is in fact a constitutional question here. I think that the constitutional question becomes much more obvious after the Supreme Court's sweeping opinion in Morales-Santana, which I think is where we're going with the second part of your question, and I'll proceed to that now. So for one, we don't believe that Catwell addresses the same issue as in this case. Catwell addressed only 1432A3. Morales-Santana deals with 1409. I thought you were looking at all of these cases in a more broad fashion, saying the jurisprudence of equal protection in this area generally has progressed, thinking that, you know, when was sort of bygone days. Morales-Santana is the way the Court's looking at it now. Somewhat, Your Honor. We don't necessarily, we don't believe that Morales-Santana sweeps Nguyen away in any real sense. Well, if you don't, then why doesn't Catwell control? There are a couple of reasons why Catwell doesn't control. One of them is it appears the Court in Catwell was applying rational basis scrutiny, which after Morales-Santana is clearly not the standard. The other is that Catwell dealt specifically with 1432A3. The petitioner in that case, his mother was still alive, and the interest that the Court relied on was the mother's interest, being an alien, and whether she might have some objection to his United States citizenship. That interest just doesn't come into play under the particular provision of the statute that we're challenging, which is 1432A2, which only applies to a surviving parent. So that statute presumes, or not presumes, to fall within that statute, the mother would have to be deceased, which is in fact the case here. And in that circumstance, the mother has no interest in objecting to the United States citizenship that can be derived through the father. So I think that's the factual distinction and the legal distinction. So you're not making an argument that there's an interrelation between A2 and A3 that gets you there. You're just relying on the practical effect of A2? So I think the one way to frame our argument is that we are saying that 1432A2, without a constitutional defect, would confer citizenship on José Teneo. The difficulty, or I guess it's a little bit difficult to understand, because that relies in part on the way it interacts with 1432A3. Because there you have it. And the reason I ask is because it appears on its face that if you just examine 1432A2, that it would act in a similar fashion regardless of gender. And that you have a better argument on A3, but then you run into capital. Well, it's the way that they interact together, Your Honor. So the gender discrimination is a little bit buried in the text here, but you've got to look at the statute as a whole and what it does. And what the second clause of 1432A3 does is it allows a child born out of wedlock to derive citizenship from the mother, regardless of whether the father is alive, and even whether the father would object or strongly object to the conference of citizenship. So, and Catwell upheld, said that was a legitimate, you know, Catwell dealt with the, said you don't have to confer citizenship when the mother is still living under 1432A3, but it didn't address the situation where the mother is deceased. The only interest asserted in Catwell is there's not an interest that's served by precluding citizenship when the mother is deceased. To take your argument in some slightly different way, am I right that what you're essentially saying is that when you look at the way the definition of child works in 1101, and then we look at 1432A2 and 3, that the upshot of that is that an unlegitimated child who's born outside the United States becomes a U.S. citizen automatically on the naturalization of the surviving parent if the parent's the mother. And it does, it cannot if the parent is the father unless the father has legitimated the child before the mother was, the mother's deceased. That is correct, Your Honor. If you take the exact same circumstances with it being the mother instead of the father, then they would be, Mr. Schneier would undisputedly be a citizen. And not only that, even if the father was still alive. But I think there are instances where legitimation isn't, excuse me, legitimation isn't required by marriage. I mean, I think there's the Uniform Heritage Act. Yes, Your Honor. That is true, but it's not true in New York or in the Dominican Republic, which are the two jurisdictions at issue here. And it wasn't true in many jurisdictions. So, legitimation in New York is only through marriage? Yes, Your Honor. In Arizona, you just need to be born to be a legitimate child. Yes, I think there's a similar in Georgia. It varies from state to state. But at the time applicable here, a lot of states were similar and a lot of foreign jurisdictions were similar to New York and the Dominican Republic. It's since changed in the direction that you're describing in a lot of states, but actually not in New York. I think it's still the same there. If we're just focusing on A2, tell me, how are the requirements different for a mother or father to pass citizenship to their child? Just putting aside A3, I think I understand. That is the reason. But on A2, I'm not getting what the difference is. It is only because A3 has an exception for the mother that there is the gender-based disparity. So, the way Judge Krauss described it, it's really the interaction between 101C1 and A2 and A3 altogether. But there's no problem with doing that for legal protection purposes. In legal protection cases, courts routinely look at the statute as a whole to see how it operates. Just because the discrimination is buried a bit in various provisions, doesn't mean Congress could have easily written a statute in one or two sentences that would have had the discrimination more clearly come to the spot. Help us focus in, because the hardest issue here, it seems to me, Patwell has already addressed the question of a distinction between mothers and fathers surviving equal protection in this very statute. It did so based on WIN and a statutory scheme there that was addressing three options, not just legitimation, but mere acknowledgment of paternity or a court order. And there's much language in WIN that talks about that being a minimal burden, that there being several alternatives. And Morales describes what's required there as parental acknowledgment, not a legitimation requirement, but acknowledgment, and distinguishes it from the physical residence requirement as being a minimal one. If we look at this and are trying to, this seems to boil down to given the interest at stake, which our court and the Supreme Court have acknowledged satisfies the important interest, this seems to boil down to this second prong, the nexus prong of equal protection. And given the burden that's placed, if legitimation is required, does that meet a substantial relation test? Tell us why it doesn't. Why legitimation, given the interest of ensuring biological paternity, of protecting the rights of an alien parent, and as the government has raised in the course of this appeal, the interest in comedy and respect for foreign and local jurisdictions' definition of legitimation, why a legitimation requirement doesn't satisfy the substantial relation test. Yes, Your Honor. So the way that this legitimation operates in practice is essentially a complete ban on the conference of citizenship from a father to an illegitimate child. It's impossible once the mother is deceased for the father to do anything about it in this circumstance. He couldn't adopt the child because adoption is not available to biological children. He couldn't legitimate because legitimation requires marriage, and he couldn't even petition to have him naturalized to a court proceeding because that provision uses the same phrase, child. So this is very different from when where you had the three options, one of which is quite easy to satisfy. All you have to do is go to a notary public and acknowledge paternity. So that is a regulation, I think, to establish the parent-child relationship, whereas this is a ban, essentially, on the conference of citizenship, a complete prohibition of the conference of citizenship from a father to an illegitimate child. And that's the difference. And the government doesn't even assert the interest in assuring the parent-child relationship because it just isn't a viable interest here. You also already have in this statute, whereas you didn't have in Wynne, that the child had to be living in the United States as a lawful permanent resident with the parent from which he is receiving citizenship, which is the father here. So the other interest that's discussed in Wynne is tied to the United States because Wynne was applying to children who were born outside the United States and living outside the United States. This statute only applies to lawful permanent residents living in the United States. So the interest the government does assert in its brief, we've dealt with in our applied brief. The first thing I'd like to point out is that no court has ever considered those to be important government interests. And the reason, so let's see, there's two that they assert. One is complete overlap of obligations and responsibilities between the parents of illegitimate children and the parents of married children. The reason why that is not an important government interest is because the only differences in most jurisdictions are things like whether you can inherit from the parent or not. It was just considerations far removed from what's really at issue in citizenship cases, which is ties to the United States. And then the other interest is comedy and deference to the laws of other states. There's no reason why that would have to be the legitimation laws of other states. It could easily be the custody laws of other states, the paternity acknowledgment laws of other states, and there's just nothing in the record that suggests that Congress was even concerned with that. Thank you.  Thank you, Your Honors. Counsel of the United States. Good morning, Your Honors. May it please the Court, Stephanie Hennis for respondent. I apologize. Shorter. The Court should deny the petition for review because Mr. Teneo is not a United States citizen. Under the relevant law, individuals like Mr. Teneo who were born abroad out of wedlock to two non-citizens could not derive United States citizenship through a father's naturalization unless the father legitimated him. This was a required aspect of being considered a child. Say we accept your statutory construction argument, why don't we have an equal protection problem given that the way you're reading the interaction of these statutory provisions, the requirement is one of legitimation. And that's far beyond what we or the Supreme Court have said standing alone meets the substantial relation test. Even accepting the important interest that you've asserted, why aren't they satisfied by something less than that? Why should we find that there is in fact a substantial relation of the obligation, the discrimination as to fathers by requiring the real legitimation, particularly where given this provision that applies to the surviving parent, it becomes an actual impossibility and makes that section, the way the government asks us to read it, absurd, doesn't it? It doesn't, Your Honor. So I would like to point out that in this case, while in the particular jurisdictions that are at issue here in New York and the Dominican Republic, in order to legitimate a child, there needed to be marriage. However, even as early as the 1930s or 1940s, close to half of the states did not require marriage in order for there to be legitimation. Secondly, Mr. Teneo was not one or two years old when his mother passed away. He actually entered the United States when he was 16 and a half years old. There was time if the parents so desired for him to be legitimated. Well, let's go back before the 1940s. Let's go back to the Federalist Papers. I mean, in Federalist Paper 42, we've drawn from Madison's writing a preference for uniform interpretation of naturalization laws. What you're suggesting applies and identifying as an important interest on the part of the government would make for a patchwork of I think Your Honor would be describing an equal protection violation based on unequal treatment among the states, which I don't believe is something that was addressed in this case. What was addressed in this case was unequal treatment based on gender. No, what I'm trying to understand is the interest the government asserts. You've told us, as I see it, you've identified three interests. One, establishing the biological paternity. And one, the respect for local and foreign jurisdictions, I mean, their definitions of legitimation. And then we in Catwell also identified another, that is, protecting the interests of the alien parent. But biological paternity is not at issue here. It's not disputed. And, of course, there are a range of ways that that can be established today as opposed to the 1940s. And where we're talking about a provision dealing with a surviving parent, the interests of the now deceased parent wouldn't seem to rise to the level of an important interest for equal protection purposes. So we're left with the interest, sort of novel one, from the government's prior positions, asserting that the reason to require legitimation is the respect for local and foreign jurisdictions. But that actually seems contrary to the government's interests and the Constitution directing us to, where possible, keeping uniformity in the naturalization laws. Okay, two points. The first, getting at the fact that the mother in this, when dealing with this provision, would have been deceased. I know the government doesn't concede that there would no longer be any interest on behalf of the deceased parent. As I pointed out, in this case, Mr. Teneo lived with his mother in the Dominican Republic for 16 and a half years. He must have built, one would think that an individual who has lived in another country for that long would have built strong connections to that country. And that the parent who had that citizenship, even though now deceased, may well have had an interest in ensuring that the child did not take on the citizenship of another country. And I know I had a second point, which got to your other question that I greatly apologize I can't remember. The comedy, the respect point for other jurisdictions? So in regard to that, opposing counsel has brought up the fact that a lot of these variations actually went to whether an individual could inherit from the father. And that's a really important interest in this case because, or in this situation, because it would help to eliminate concerns about fraudulent transfers of naturalization. And in fact, as Respondent pointed out in our brief, there was some consideration by Congress to eliminate legitimation and have that be one potential way of meeting the filial bond and paternity requirements, recognizing that parental acknowledgement was also a way that some states allowed individuals to be legitimated, but ultimately did not accept that. But that legislative history just goes to the statutory construction point. On equal protection, in Wynne and Morales, repeatedly there's reference to it being a parental acknowledgement requirement with language like, we are mindful that the obligation it imposes with respect to the acquisition of citizenship by the child of a citizen father is minimal. This circumstance shows Congress has not erected inordinate or unnecessary hurdles to the conferral of citizenship on the children of citizen fathers, furthering its important objectives. Only the least onerous of three options provided must be satisfied, that is, the acknowledgement requirement. And here you're saying that we should find the substantial relation, the nexus satisfied by something far more onerous, and in cases like as we have here, where the legitimation requirement involves marriage, actually impossible for the father to satisfy with a deceased mother. Well, once again, I'll reiterate that this was not impossible. There was a significant period of time within which the petitioner's father could have married the mother. I will point out in Wynne the... Yeah, but that doesn't answer the question, right? I mean, the question is, we have a set of facts now we're not thinking about before, and under these set of facts, what's the answer to the question? There were still other ways for Mr. Tineo to become a citizen. Well, that's at least disputed, right? Because we know that the Uniform Parentage Act doesn't apply in New York, apparently, and there's no pathway in New York to parental acknowledgement. So what do we have that responds to the question? He still couldn't have become a citizen, and this was something that was pointed out in Wynne. When he turned 18, he was a lawful permanent resident, so he could have applied to naturalize, and he had about four years between the time that he would have been able to apply for naturalization and his first conviction that may have presented an impediment to him becoming a citizen. So the other thing I was going to point out in Wynne is that the Supreme Court does point out that none of their gender-based classification cases have required that the statute be capable of achieving its ultimate objective in every instance. And this is the reason why I point out that it's not as though Congress was dictating that in order to legitimate a child, you must marry the mother of the child. There are a lot of instances where that would not be required. Looking back to the 1940s and the legislative history to which you've pointed us, it seems that was Congress's intent, at least at the time. And looking back to Morales, where we're again weighing the interest and the substantial relationship, why shouldn't we conclude, as the Supreme Court did there, that given how heavy the burden is of requiring legitimation, that alone as a pathway to citizenship under 1432, that that is stunningly anachronistic, that there are all sorts of different ways to satisfy the interest that the Supreme Court and we have repeatedly identified, which is establishing biological paternity. Again, Your Honor, it isn't stunningly anachronistic. I think that when you pointed out that looking at the legislative history, it did seem that Congress was interested in ensuring that there was marriage. I think our position would be the counter to that, that if they really wanted there to be marriage and they wouldn't have simply gone by the legitimation laws of the different states, they already knew that many of the states did not in fact require marriage in order to legitimate the child, which would then show that Congress was not dictating that in order to show parental acknowledgement and the proper connection between the father and child, what was necessary was marriage. The Supreme Court tells us to focus on the interest today. And is it still such an important interest today that the burden that's being imposed carries the requisite relationship to meeting that obligation? How is that the case here? How is it that a requirement of legitimation, which results in this patchwork of different applications, some so onerous that it's an impossibility to satisfy, today meets the equal protection test? Again, Your Honor, the government doesn't see how this is an impossibility to satisfy. The petitioner has brought that up on a lot of occasions, but this was something that could be done. And again, in his case, there was a lengthy period of time. Assuming that the parents that the father has to marry the mother. Even that as an obligation that's imposed is a far greater one than the Supreme Court in Wynne and in distinguishing Wynne and Morales is describing when it talks about a parental acknowledging requirement that it reputedly calls minimal, right? I understood, Your Honor. The burden, if we're only looking at the legitimation laws of the states in effect at the relevant time period, it would be more onerous than what was considered in Wynne. So if you concede that it's more onerous, what does that do to our analysis? Does that mean that you would concede that there's an equal protection violation as it relates to A3? Because we're looking at the set of circumstances at a particular point in time, which is now. We're looking at the reality of what would be in effect in New York, which is legitimation is the only requirement. And if it's more onerous than a parental acknowledgement, which is not available, right, then wouldn't that satisfy the substantial burden, which would lead to an equal protection violation? Would you agree or disagree with that? I would not agree that there's an equal protection violation. And you're talking about in regard to A3 or the statute that we're dealing with in this case? Well, I mean, that's the key question here, right? Because I think the point is that if you look at A2 in isolation, the answer is, the impossible answer is no, there's not. But if you look at, you know, A1 through A5 and look at the interrelation between the five subsections, the answer could be different as to A3. I mean, I'm pretty sure that's the point that your adversary is making. But my original ‑‑ don't worry about what I'm like. My original point is in response to Judge Krause's question, it sounded like you conceded that in an instance where legitimation was the only opportunity, that you would concede that that was a more substantial burden than in instances where parental acknowledgement was available. Yes? I concede that it is more onerous than simply being able to acknowledge. But I'm not conceding that that then leads to an equal protection violation in this case. Great. So then the question is, why not, given the setup that we have here? So another thing that I would like to bring up in regard to Nguyen is that in that case, we weren't dealing with either of the statutes that we're dealing with in this case. These statutes have to do with derivative citizenship, not acquired citizenship. Now, in Nguyen, it was a separate statute that had to do with acquired citizenship, which is a way that a parent can pass along birthright citizenship. In this case, we're dealing with something different. We're dealing with derivative citizenship, which means that a parent who naturalizes, which is a benefit that the United States has afforded by statute, can then also be passed along derivatively to a child if meeting certain requirements. So I would focus on the distinction in this case between the derivative nature of a benefit versus the acquired citizenship, not naturalization, the acquired citizenship that was at issue in Nguyen. I'm so sorry. I don't understand how that relates to the burden analysis that I thought we were talking about. My argument would be that it would adjust the calculus of the burden because the United States' interests in dictating who would naturalize versus who obtained citizenship at birth are stronger ones that are subject to additional because they come from statute that Congress has more leeway in determining what those are without violating equal protection. Can you address this statutory provision, 1432, has been repealed. It's replaced with a different statute, not before us. So say we disagree with you and think that the former statute, the way you've said it needs to be construed, does violate equal protection, at least as applied here. What impact does that really have? I mean, is it anything beyond this case, given it's a repealed statute? How many cases like this are pending? It may well impact numerous cases if we're going to look at the OLC opinion, which in a footnote talks about how the department, excuse me, if the agencies wanted to put forth the interpretation that was actually utilized in this case, and the OLC opinion is dealing with the new version of the derivative citizenship statute. So it says that the OLC believed that it would be an appropriate use of the, it would be an appropriate interpretation of even the more recent statute. So I would say that it does have more far-reaching consequences because the State Department in that, and I apologize, Tara. Is there any other provision in the code that imposes a requirement of legitimation alone as a requirement? I haven't found it, but maybe you can point us to one. So there actually is another provision, the older version of the statute that was being considered in Nguyen. The only reason that that had legitimation and two additional ways of establishing paternity or filial bond was that it had been amended in the statute. And I point this out in my brief. I apologize, I don't know the precise page number. Legitimation is the required means of establishing whether a non-marital father would be able to pass his citizenship to his child through the acquired citizenship. So I think it's former 1309. But there's no current provision in the immigration code other than the one we're addressing where the only way to acquire the benefit in question is legitimation. Is that right? I am not positive of the answer, Your Honor. I would be very happy, though, to provide you an additional filing on that. I'm not prepared to say right now whether there would be any other provision as the law is in effect right now. I will point out, though, Your Honor, that the new provisions in the INA don't yet apply to these older cases. So even though the provisions have since been rescinded and replaced with new provisions, these cases aren't going away because there are still people who have claims to citizenship under the former version of the INA like we have here. Thank you very much, Ms. Hennessey. We'll have Mr. Circhio back for rebuttal. Can I ask you about a circumstance that arises, I think, out of A2? Tell me if I'm thinking about this correctly. So as you would imply, right, if the mother dies first and the child is not legitimated, that child cannot be naturalized. If the father dies first and the child is not legitimated, that child cannot be naturalized. So are you saying the father is a citizen in this hypothetical? I'm saying that it's the same factual predicate as you would have under A2, right? So the father, A2 is the naturalization by the parent if one of the parents is deceased. So, yes. If it's the mother who is a citizen, then the father wouldn't even have to die. He would be a citizen automatically upon naturalization of the mother if he's living in the United States with the mother under A3. So that's what I'm trying to say.  Suppose he wasn't a citizen? So what I'm trying to figure out is, under A2, doesn't that present, from a gender perspective, an equipoise, whether it's a mother or a father, they'd be in the same position with regard to whether or not the child could be naturalized if the child is not legitimated? No. Under A3, even when the father is still alive, regardless of whether the father is alive or deceased, the child can derive citizenship from the mother in these circumstances. So that's why I see interaction between the two. I'm not sure if I can explain. No, you answer the question. So a couple of points in rebuttal. First, the distinction that the government is trying to draw between acquired citizenship at birth, they're now calling it, and naturalized citizenship, that's contrary to positions the government's taken in the past. In a briefing in Raleigh-Santana, it said explicitly that for constitutional purposes, there are two types of citizens, those that are citizens at birth under the 14th Amendment, being those born in the United States, and then citizens that say that any citizen that doesn't fall in that category is a naturalized citizen, even if it's a citizen at birth. So any citizen by statute falls in the same category for constitutional purposes, so I don't think that's a distinction that makes any difference in this case. To the point that legitimation wasn't possible, I think the government is saying that they could have married and those types of things, and it said that they dispute whether it was impossible. As the court has pointed out, those are significant burdens far beyond the burdens that arose in Lynn. The government also makes the point that he could have naturalized. Once he turned 18, he could have filed his own petition for naturalization. That's true, but it's kind of beside the point here, because this is an equal protection claim asserted on behalf of his father, which he can do under the court's jurisprudence of the third-party standing doctrine. So that doesn't really satisfy his father's interest in conferring his own citizenship to his son. That's something entirely separate. So I think it makes sense to look at other courts have looked at 1433 and whether that's an available remedy, because 1433 is a petition filed by a parent on behalf of a child. It makes sense to consider that as part of the scheme, and of course that's not available here. The court in Pierre used 1433. Let me ask you a question. Is it your position that there is a way to grant you the relief you seek without overturning Catwell? I do, Your Honor. I believe this court can leave Catwell in place. So the specific remedy that we've requested on page 50 of our opening brief is just a clause that would be added to 1432A2, and it would only address the equal protection violation here, which is the inability to confer citizenship once the mother is deceased. So the interest in Catwell, as I said in my opening argument, was this interest of the mother in the citizenship of her child, which the government says that she may still have an interest even after she's deceased. We don't believe that's plausible or sufficient to carry equal protection analysis. But that is a distinguishing basis that this court could decide there's an equal protection violation here and decide that Catwell can stand. I do think Ron Santana perhaps calls Catwell into question a little bit to the extent that Catwell was based on rational basis scrutiny as opposed to intermediate scrutiny, but I think that's another case. I think there would be difficulties fashioning a remedy in a case like that, whereas it's quite easy here. And to get to Judge Krause's point, I do think this is a very narrow category of people who are affected because it's only people who are living in the United States with a father after the mother is deceased. Thank you very much. Thank you. Your time is up. Thank you. Thank you very much, counsel, in a very interesting, somewhat unusual case. We thank you both for your helpful arguments. We take the matter under advisement.